# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CLAUDIA A. BARBER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 17-cv-620 (KBJ) |
| | ) | |
| DISTRICT OF COLUMBIA | ) | |
| GOVERNMENT, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Claudia Barber served as an Administrative Law Judge ("ALJ") for the

District of Columbia Office of Administrative Hearings ("OAH") for eleven years, from

August of 2005 until August of 2016, when she was terminated from that position.

(*See, e.g.*, First Am. Compl. ("*Barber I* Compl."), ECF No. 11, ¶ 8; Compl. ("*Barber II*

Compl."), No. 17-cv-1680, ECF No. 1-3, ¶ 7.)[1] In two consolidated complaints, Barber

brings eleven claims against five defendants related to her tenure and eventual

termination.[2] Generally speaking, Barber alleges that despite meeting or exceeding

performance expectations throughout her service as an ALJ at OAH, she experienced

discrimination based on her race and color, including repeated denials of promotions.

(*See Barber I* Compl. ¶ 8; *Barber II* Compl. ¶¶ 7–18.) Barber also claims that her

---

[1] Unless otherwise noted, filings cited in this opinion refer to documents filed in case number 17-cv-620.

[2] The defendants are: the District of Columbia ("the District"); OAH Chief ALJ Eugene Adams, OAH General Counsel Vanessa Natale, OAH Attorney-Advisor Shawn Nolen (collectively, "the District Defendants"); and Ronald Jarashow, a Maryland attorney and former judge on the Circuit Court of Anne Arundel County.

supervisors retaliated against her between November of 2014 and January of 2016, after she made both formal and informal complaints to management about racial discrimination and other concerns. (*See Barber I* Compl. ¶¶ 60–62; *Barber II* Compl. ¶¶ 8–18, 38–39, 55–56.)

Before this Court at present are two motions that Defendants have filed, which, collectively, seek to dismiss all of the counts in Barber's two consolidated complaints for various reasons. (*See* Dist. Defs.' Mot. to Dismiss Pl.'s Compl. with Prejudice ("Dist. Defs.' Mot."), ECF No 25; Def. Jarashow's Mot. to Dismiss ("Jarashow's Mot."), ECF No. 26.) As explained below, this Court concludes that the Defendants' motions must be **GRANTED IN PART AND DENIED IN PART**. In short, the Court will dismiss all of the counts that pertain to constitutional and tort claims, but will permit the counts that relate to employment discrimination and retaliation to proceed.

## I.

The facts recited in this opinion are gleaned from Barber's consolidated complaints and must be accepted as true, *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); notably, they need not be recounted in full for the purpose of the instant ruling. It suffices to say here that Barber alleges that despite meeting or exceeding performance expectations throughout her tenure as an ALJ at OAH, she experienced discrimination based on her race and color—including repeated denials of promotions—as well as retaliation when she made complaints about her supervisors' allegedly discriminatory practices. (*See Barber I* Compl. ¶ 8; *Barber II* Compl. ¶¶ 7–18.)

Three examples illustrate some of the many alleged instances of discrimination and retaliation that are recounted in Barber's consolidated complaints. Barber alleges that in November of 2014, she complained to Wanda Tucker, the interim Chief ALJ, that "African American ALJs routinely received less complex and less serious cases than their Caucasian counterparts." (*Barber II* Compl. ¶ 8.) Approximately three days after complaining to Tucker, Barber allegedly was not assigned to a Principal ALJ ("PALJ") position to fill a vacancy, even though she had been routinely assigned to fill such vacancies over the previous nine years. (*Id.*) Several months later, when another PALJ position opened up, Tucker allegedly "instituted unreasonable selection criteria in an effort to disqualify and retaliate against [Barber]" and to "discourage and eliminate African American ALJs from applying for the open position[.]" (*Id.* ¶ 13.) Indeed, Barber alleges that when she expressed her interest in the position, Tucker required her to complete "the equivalent of a literacy test, which . . . Barber found humiliating." (*Id.*) And eventually Paul Handy, a Caucasian male, was selected for the PALJ position. (*Id.*) Thereafter, in January of 2016, OAH Chief ALJ Eugene Adams "announced a new plan for the fair selection of PALJs" whereby the OAH would "promote those ALJs who volunteer to be PALJs alphabetically[,]" and under this new system, Barber was allegedly the next ALJ slated to be promoted. (*Id.* ¶ 18.) However, Barber alleges that Adams promoted a Caucasian woman over her instead, ignoring the selection plan. (*Id.*) According to Barber's pleadings, this "was the third time a less qualified Caucasian ALJ was selected for a PALJ position over . . . Barber." (*Id.*)

Due to Barber's concerns with her workplace environment and the limited opportunities for advancement as an ALJ, Barber began to consider running for a

position as a judge on the Circuit Court for Anne Arundel, Maryland.  (*See id.* ¶ 16.)

She sought guidance from the District's Commission on Selection and Tenure

("COST") and the Board of Ethics and Government Accountability with respect to her

ability to run for the Maryland judicial position without resigning from her position as

an ALJ in the District of Columbia.  (*See Barber I* Compl. ¶¶ 9–10.)  After allegedly

receiving mixed responses from some District employees and no responses from others,

Barber filed a Certificate for Candidacy in Maryland on January 20, 2016, listing her

party affiliation as "Judicial."  (*See id.* ¶¶ 9–13.)

In February of 2016, Defendant Jarashow, a Maryland attorney and former Anne

Arundel County Circuit Court judge "who was supporting other candidates for the

vacant circuit judge positions[,]" informed Chief ALJ Adams of Barber's candidacy.

(*See id.* ¶ 15.)  Jarashow allegedly maintained that two provisions of the District's Code

of Ethics for ALJs required Barber to resign from her ALJ position in DC upon

becoming a judicial candidate elsewhere.  (*See id.*)  Defendant Chief ALJ Adams

subsequently placed Barber on administrative leave with pay, and after a COST hearing

in July of 2016, Barber's employment as an ALJ was terminated for an ethics violation

on August 2, 2016.  (*See id.* ¶¶ 21, 32–33.)

Barber filed a complaint against all Defendants in this Court on April 6, 2017,

which she amended on May 22, 2017 ("*Barber I*").  (*See* Compl., ECF No. 1; *Barber I*

Compl.)  The operative complaint in *Barber I* contains seven counts:  two constitutional

claims against the District alleging violations of procedural and substantive due

process; a constitutional claim against the District pursuant to section 1983 of Title 42

of the United States Code ("Section 1983"); a civil conspiracy claim brought under

section 1985 of Title 42 of the United States Code ("Section 1985") against all Defendants; a claim under the D.C. Whistleblower Protection Act (DCWPA), D.C. Code §§ 1-615.51–1-615.59, against the District Defendants; and two common law tort claims against Jarashow. (*See Barber I* Compl. at 12–22.)[3] On July 19, 2017, Barber filed a second and separate complaint against the District and Adams in the Superior Court of the District of Columbia ("*Barber II*"); Defendants removed this complaint to federal court on September 11, 2017. (*See* Not. of Removal, No. 17-cv-1860, ECF No. 1.) The complaint in *Barber II* includes four counts alleging workplace discrimination brought pursuant to the D.C. Human Rights Act (DCHRA), D.C. Code §§ 2–1401.01– 2-1411.06, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2000e-17. (*See Barber II* Compl. at 12–17.) This Court granted the District Defendants' motion to consolidate the two cases on October 17, 2017, and ordered all Defendants to file omnibus responses to both complaints. (*See* Order Granting Mot. to Consolidate, ECF No. 22, at 4–5.)

On November 11, 2017, Defendants filed two motions to dismiss Barber's consolidated complaints. The Court held a lengthy motion hearing on May 9, 2019, after which it took the motions under advisement. (*See* May 9, 2019 Hr'g Tr. ("Hr'g Tr.").)

## II.

As the Court explained to the parties during the motion hearing, a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint." *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). Therefore,

---

[3] Page numbers herein refer to those that the Court's electronic case-filing system automatically assigns.

"[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). The plaintiff is not required to provide "detailed factual allegations," but rather must only plead enough facts to "raise a right to relief above the speculative level" and to "nudge[] their claims across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 555, 570 (internal quotation marks and citation omitted). At the motion-to-dismiss phase, a court must "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged," *Browning*, 292 F.3d at 242 (alterations, internal quotation marks, and citation omitted), but it need not "accept legal conclusions cast as factual allegations[,]" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012).

The Court also explained that the eleven counts that Barber had brought between the two complaints could be logically grouped into three categories: employment claims (*Barber I* Compl., Count V; *Barber II* Compl., Counts I, II, III, and IV); constitutional claims (*Barber I* Compl., Counts I, II, III, and IV); and tort claims (*Barber I* Compl., Counts VI and VII). (*See* Claims Handout, ECF No. 42.) The Court asked the parties to address these claim categories, in turn, during the motion hearing.

## III.

Barber's complaints contain five counts alleging employment discrimination and retaliation under the DCHRA, the DCWPA, and Title VII of the Civil Rights Act. (*See Barber I* Compl., Count V; *Barber II* Compl., Counts I, II, III, and IV; *see also* Claims

6

Handout.) All of these claims survive Defendants' motion to dismiss, in at least some form, as explained below.

A.

With respect to Barber's DCHRA and Title VII discrimination claims (Counts I and III of *Barber II*), Barber's complaint alleges that she was discriminated against based on her race and color. (*See Barber II* Compl. ¶¶ 30, 47.) Notably, "[c]ourts in this Circuit 'have consistently recognized the ease with which a plaintiff claiming employment discrimination can survive . . . a motion to dismiss[,]'" *McNair v. District of Columbia*, 213 F. Supp. 3d 81, 86 (D.D.C. 2016) (quoting *Fennell v. AARP*, 770 F. Supp. 2d 118, 127 (D.D.C. 2011)). "In other words, the factual detail required to survive a motion to dismiss can be quite limited." *Id.* at 86–87 (internal quotation marks and citation omitted). This is because a plaintiff need not prove a *prima facie* case at the motion-to-dismiss stage: instead, with respect to both Title VII and the DCHRA, "a plaintiff need only allege that she (1) suffered an adverse employment action (2) because of her membership in a protected category." *Id.* at 86. Moreover, an "adverse employment action" is any event that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) (citations omitted).

Barber has successfully pleaded her discrimination claims, on the basis of *at least* the following alleged facts, which, viewed collectively, are sufficient to give rise to a plausible claim of race discrimination: (1) the PALJ position was qualitatively

different from the ALJ position because of its supervisory duties (*see id.* ¶ 9); (2) PALJs were paid more than ALJs (*see id.*); (3) less qualified Caucasian ALJs were repeatedly selected for the better-compensated PALJ position over Barber and other more senior African American ALJs (*see id.* ¶¶ 12, 18); and (4) on one occasion in February 2016, Barber's non-selection violated an established plan for ALJs to be promoted to PALJs alphabetically (*see id.* ¶ 18).  Taken together, these facts are sufficient to support an inference that Barber suffered an adverse action when she was not promoted to the qualitatively different and higher-paying PALJ position (*see id.* ¶¶ 9, 12, 18, 30, 47), and that this non-promotion was motivated by her race (*see id.* ¶¶ 8–13, 18, 30, 47).[4]

The District Defendants argue that Barber's non-promotion to the PALJ position was not an "adverse action" because, among other things, Barber did not plead that PALJs were paid more *at the time of her alleged non-promotions*.  (*See* Dist. Defs.' Mot. at 25.)  But Barber's complaint alleges that PALJs were paid more than other ALJs for at least some period of time (*see Barber II* Compl. ¶ 9), and nothing in the complaint suggests that the pay differential changed.  "[C]onstru[ing] the complaint liberally, [and] granting [Barber] the benefit of all inferences that can be derived from the facts alleged," *Browning*, 292 F.3d at 242 (internal quotation marks and citation omitted)—as the Court must do at this stage of litigation—it is at least plausible that PALJs were paid more than ALJs throughout Barber's tenure.

---

[4] Nothing about this opinion reduces or limits Barber's employment discrimination claims to these facts alone.  Given the extensive factual allegations in Barber's consolidated complaints, this Court has opted to highlight only *some* of the relevant facts, and has rested its analysis on a minimum set of circumstances that, if true as pleaded, "raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555.

The District Defendants also dispute that the alleged facts demonstrate the requisite causation; specifically, they insist that Barber was not selected as a PALJ according to the alphabetical plan in February of 2016 because she was placed on administrative leave with pay on February 12, 2016. (*See* Dist. Defs.' Mot. at 26.) However, once again, this contention improperly ignores the Court's duty to accept the allegations of the complaint as true and to construe the complaint liberally at the motion-to-dismiss stage. *See Browning*, 292 F.3d at 242. Barber's complaint plainly alleges that "[i]n January 2016, Defendant Adams announced a new plan for the fair selection of PALJs" (i.e., the aforementioned plan "to promote those ALJs who volunteer to be PALJs alphabetically") and also states that the timing was such that "Barber should be the next ALJ to be promoted to PALJ" under this new scheme. (*Barber II* Compl. ¶ 18.) However, according to the complaint, "[i]n February 2016, Defendant Adams instead promoted a Caucasian ALJ, Sharon Goodie, to PALJ and ignored the selection plan[.]" (*Id.*) Given this timing, it is at least plausible that the allegedly discriminatory non-selection of Barber in a manner that was inconsistent with the established plan occurred *prior to* February 12, 2016. Therefore, the District Defendants' motion to dismiss Barber's Title VII and DCHRA discrimination claims will be denied.

## B.

Turning to Barber's retaliation claims, *Barber II* alleges in Counts II and IV that the District Defendants retaliated against her in violation of the DCHRA and Title VII. (*See id.* ¶¶ 38–39, 55–56.) To state a claim for retaliation under Title VII or the DCHRA, a plaintiff "must establish three elements: [(1)] that she made a charge or

opposed a[n unlawful] practice . . ., [(2)] that the employer took a materially adverse action against her, and [(3)] that the employer took the action because of her protected conduct." *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015) (citation omitted).  The relevant provisions of the DCHRA are generally interpreted consistent with Title VII, *see, e.g.*, *Craig v. District of Columbia*, 74 F. Supp. 3d 349, 368–69 (D.D.C. 2014) (citations omitted); *Elhuseeini v. Compass Group USA, Inc.*, 578 F. Supp. 2d 6, 10 n.4 (D.D.C. 2008) (collecting cases), and it is well established that the scope of adverse actions for Title VII retaliation claims is broader than it is for discrimination claims because Title VII's "antiretaliation provision . . . is not limited to discriminatory actions that affect the terms and conditions of employment[,]" *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 64 (2006) (citation omitted); *see also Siddique v. Macy's*, 923 F. Supp. 2d 97, 107 n.10 (D.D.C. 2013) (explaining that federal courts in this district apply *Burlington Northern* to DCHRA retaliation claims).  Instead, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington*, 548 U.S. at 68 (internal quotation marks omitted) (citing *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).

Barber has successfully pleaded her retaliation claims, based on *at least* the following alleged facts:  (1) on November 17, 2014, Barber made an internal complaint about racial discrimination in the assignment of complex cases (*see id.* ¶ 8); (2) approximately three days later, Barber was not assigned to a vacant PALJ position, even though she had routinely been assigned to similar positions in the past (*see id.*); and (3)

one month later, on December 2, 2014, Barber was again denied promotion to the PALJ position (*see id.* ¶ 11). These events, which are temporally proximate to one another, along with other, similar facts alleged in the complaint, are sufficient to support an inference of unlawful retaliation. *See Hamilton v. Geithner*, 666 F.3d 1344, 1358 (D.C. Cir. 2012) (explaining that causation can be reasonably inferred when two events are "very close in time" (internal quotation marks and citation omitted)); *Singletary v. District of Columbia*, 351 F.3d 519, 525 (D.C. Cir. 2003) (describing temporal proximity as "quite close" when allegedly retaliatory act occurred a month after protected activity).[5]

Furthermore, the Court rejects the District Defendants' argument that Barber's non-selection to the PALJ position was not a materially adverse action because PALJs "were not paid more than ALJs at the relevant time[.]" (*See* Dist. Defs.' Mot. at 30.) As explained in Section III(A), *supra*, Barber has alleged that PALJs were paid more than ALJs (*see Barber II* Compl. ¶ 9), and that she was denied the opportunity to serve as a PALJ after she complained to Tucker about discrimination (*see id.* ¶¶ 8, 11). These allegations are more than sufficient, given the capacious adverse-action framework that is applicable to retaliation claims. *See Burlington*, 548 U.S. at 64. Thus, this Court will also deny the District Defendants' motion to dismiss with respect to Barber's Title VII and DCHRA retaliation claims.

C.

Count V of *Barber I* alleges that the District, Adams, Natale, and Nolen retaliated against Barber in violation of the District of Columbia Whistleblower

---

[5] *See* n.4, *supra*.

Protection Act, D.C. Code §§ 1-615.51–1-615.59. The purpose of the DCWPA is to "'increase protection for District government employees who report waste, fraud, abuse of authority, violations of law, or threat[s] to public health or safety[.]'" *Sharma v. District of Columbia*, 791 F. Supp. 2d 207, 216 (D.D.C. 2011) (quoting Whistleblower Protection for Certain District Employees, 1998 D.C. Laws 12–160, Act 12–398). "In order to establish a *prima facie* case under the [DCWPA], [a] plaintiff must allege facts establishing that [(1)] she made a protected disclosure, [(2)] that her supervisor retaliated or took or threatened to take a prohibited personnel action against her, and [(3)] that her protected disclosure was a contributing factor to the retaliation or prohibited personnel action." *Tabb v. District of Columbia*, 605 F. Supp. 2d 89, 98 (D.D.C. 2009).

Barber alleges that she made two disclosures that the DCWPA protects: a complaint that she filed with the Office of the Inspector General in January of 2016, and a negative response that she made to an auditing survey in April of 2016. (*See Barber I* Compl. ¶ 60.) Barber's complaint also maintains that retaliation based on those disclosures "was a substantial or motivating factor" in the disciplinary proceedings that began in February of 2016 and resulted in her termination in August of 2016. (*See id.* ¶ 62.) This Court finds that Barber has sufficiently pleaded a DCWPA claim based on *at least* the following alleged facts: (1) she made a protected disclosure to the Office of the Inspector General in January of 2016, by complaining that "Adams ordered OAH ALJs to attend mandatory diversity training and later allowed a large number of Caucasian ALJs to not attend the training that was already paid for by taxpayers" (*see id.* ¶ 60); (2) Adams, her supervisor (*see id.* ¶ 5), knew about her

disclosure by April of 2016 (*see id.* ¶ 60); and (3) her disclosure motivated Defendants—including Adams—with respect to various adverse employment actions they instituted against her, which started in February of 2016 and culminated when she was terminated in August of 2016 (*see id.* ¶ 62). Accepting these facts as true, the Court concludes that it is plausible that Barber made a protected disclosure that contributed to Adams's February 2016 decision to place her on administrative leave with pay in a manner that gives rise to an actionable DCWPA claim, even if Adams may have also been motivated by Barber's decision to run for judicial office.

In their briefing, the District Defendants dispute whether Adams *knew* about Barber's January 2016 disclosure before he placed Barber on leave in February of 2016. (*See* Dist. Defs.' Mot. at 22.) They insist that the complaint's allegation that Adams knew "*by* April of 2016" does not mean that he knew of the disclosure "*in February [of] 2016.*" (Dist. Defs.' Reply, ECF No. 31, at 16 (second emphasis in original).) In addition, at the motion hearing, the District Defendants argued (for the first time) that Barber's January 2016 disclosure did not qualify as a protected activity, because Barber merely revealed a policy or management disagreement rather than making a statement that she "reasonably believe[d] evidence[d]" "[g]ross mismanagement"; "[g]ross misuse or waste of public resources or funds"; "[a]buse of authority in connection with the administration of a public program or the execution of a public contract"; [a] violation of a federal, state, or local law, rule, or regulation, or of a term of a contract between the District government and a District government contractor which is not of a merely technical or minimal nature"; or "[a] substantial and specific danger to the public health

13

and safety[,]" as the DCWPA requires. D.C. Code § 1-615.52(a)(6)(A–E). (*See* Hr'g Tr. at 41:10–43:17.)

As this Court has explained repeatedly (both during the hearing and herein), arguments of this type raise *factual* disputes that are not appropriately considered at the motion-to-dismiss stage of a case. (*See, e.g.*, *id.* at 26:24–27:16, 57:25–58:19.). *See also, e.g.*, *Brown v. District of Columbia*, No. 15-cv-1380, 2019 WL 2437546, at *6, 8–9 (D.D.C. June 11, 2019). In the instant context, so long as it is at least plausible that Barber's January 2016 disclosure qualified as protected based on its alleged contents, and that Adams knew about the disclosure prior to placing Barber on administrative leave in February of 2016, Barber's DCWPA claim may proceed. *See, e.g.*, *Democracy Partners v. Project Veritas Action Fund*, 285 F. Supp. 3d 109, 121 (D.D.C. 2018) (explaining that "[a]t [the motion-to-dismiss] stage of the proceedings, the factual allegations in the complaint must be taken as true").

This Court has a different view of Barber's DCWPA claims against individual defendants Natale and Nolen, as well as any DCWPA claim based on Barber's April 2016 response to an auditing survey. (*See Barber I* Compl. ¶¶ 58–63.) First of all, nothing in the complaint supports Barber's argument that this Court can make "[a] reasonable inference from the complaint . . . that Defendant Adams disclosed Plaintiff Barber's complaint to other OAH employees, including Defendants Nolen and Natale." (*See* Pl.'s Opp'n to Dist. Defs.' Mot. ("Pl.'s Dist. Defs. Opp'n"), ECF No. 29, at 39.) This is because the complaint alleges only that *Adams* knew about Barber's January 2016 disclosure (*see Barber I* Compl. ¶ 60), and there are no plausible allegations concerning Natale's or Nolen's knowledge of Barber's protected disclosures to OAH in

14

January of 2016, nor does the complaint say anything about their knowledge of any other potentially protected disclosures. (*See generally Barber I* Compl.; *Barber II* Compl.) Thus, there are no facts from which to infer that these individual defendants could have retaliated against Barber in violation of the DCWPA. (*See* Dist. Defs.' Mot. at 22.)

Second, Barber has failed to plead that anyone who took an allegedly retaliatory action against her knew about her April 2016 negative response to the DC Auditor survey. (*See Barber I* Compl. ¶ 61; *see generally id.*; *Barber II* Compl.) Therefore, again, there is no factual basis upon which to draw any inference that any defendant knew of Barber's survey response and retaliated against her for that known, protected conduct.

Consequently, Barber's DCWPA claim may proceed only against the District and Adams, and only to the extent that the claim relies on Barber's January 2016 disclosure to the Office of the Inspector General and on any retaliatory conduct by Adams.[6]

### III.

In addition to the employment discrimination and retaliation claims addressed in Section II above, Barber's complaint includes four counts against the District and individual defendants Adams, Natale, Nolen, and Jarashow, alleging various constitutional violations. (*See Barber I* Compl. at 12–18 (Counts I, II, III, and IV).) Specifically, Barber claims that the District violated her constitutional rights to

---

[6] Courts in this district have long held that the DCWPA does not provide a private right of action against individual supervisors, *see, e.g.*, *Williams v. Johnson*, 537 F. Supp. 2d 141, 148 (D.D.C. 2008), and it is well established that "this Circuit treats the lack of a right of action as an issue of failure to state a claim upon which relief can be granted," *see Boritz v. United States*, 685 F. Supp. 2d 113, 126 n.6 (D.D.C. 2010). But the District Defendants have not argued that Barber lacks a right of action against Adams under the DCWPA in the instant motion to dismiss, and this Court declines to address that issue *sua sponte*.

procedural due process and substantive due process (*see id.* at 12–15 (Counts I, II));

that the District has a "custom or policy" concerning judicial elections that violates the

Fourteenth Amendment's Equal Protection Clause and Fifth Amendment's right to

contract (*see id.* at 15–16 (Count III)); and that the District and the individual

defendants "deprived [Barber] of equal protection of the laws and/or privileges under

the laws by conspiring to violate her due process rights under the Fifth Amendment and

. . . the Equal Protection Clause of the Fourteenth Amendment" (*id.* ¶ 54; *see also id.* at

16–18 (Count IV)).  In their current form, none of these claims survive Defendants'

motions to dismiss.

<u>A.</u>

In Count I of *Barber I*, Barber alleges, as a freestanding constitutional claim, that

the District violated her procedural due process rights.  (*See id.* ¶ 37.)[7]  Some of the

factual allegations that are references in Barber's complaint relate to alleged due

process violations in connection with Barber's termination, while others relate to

alleged reputational harm that District employees caused after Barber was terminated.

(*See id.* ¶¶ 38–39.)  Thus, at the outset, it is unclear whether Barber's procedural due

process claim is based upon purported deficiencies *in her termination process*, and thus

turns upon the adequacy of the notice and any hearing she was afforded, *see Propert v.

District of Columbia*, 948 F.2d 1327, 1332–33 (D.C. Cir. 1991), or whether her claim is

---

[7] The Court characterizes this claim as "freestanding" because it appears that Barber intends to raise it directly under the Constitution, whereas procedural due process claims are typically pleaded pursuant to Section 1983 of Title 42 of the United States Code, which creates a cause of action through which a plaintiff may recover monetary damages following the deprivation of constitutional rights.  (*See* Hr'g Tr. at 16:7–17:13; 53:10–55:5.)  *See also, e.g., Steinberg v. Dist. of Columbia*, 901 F. Supp. 2d 63, 75–77 (D.D.C. 2012) (denying summary judgment with respect to a procedural due process claim against the District pleaded pursuant to Section 1983); *Clay v. Dist. of Columbia*, 831 F. Supp. 2d 36, 44–45 (D.D.C. 2011) (dismissing a procedural due process claim against the District pleaded pursuant to Section 1983 because plaintiff failed to allege municipal liability adequately).

based upon an alleged reputational injury, which is assessed based on the combination of an "adverse job action" and either "official defamation" or "a stigma or other disability that foreclosed [her] freedom to take advantage of other employment opportunities." *Hutchinson v. C.I.A.*, 393 F.3d 226, 230–31 (D.C. Cir. 2005) (internal quotation marks and citation omitted).

Notably, these are different legal theories of a procedural due process violation, and these distinct theories rely on different factual allegations. Thus, it is clear to this Court that Barber's procedural due process claim does not provide adequate notice to the District under Federal Rule of Civil Procedure 8. *See Jiggetts v. District of Columbia*, 319 F.R.D. 408, 416–17 (D.D.C. 2017). Because of this, the Court will grant the District's motion to dismiss Count I of *Barber I*, but it will also grant the oral motion to amend the complaint that Barber's counsel made at the motion hearing as to this claim, consistent with the Order accompanying this Opinion. (*See* Hr'g Tr. at 82:23–83:5; *see also id.* at 52:19–54:4.)

B.

Barber further alleges, in Count II of *Barber I*, that the District violated her "substantive due process rights by demanding that she resign from her position as an ALJ . . . and thereafter removing her . . . based on an alleged violation of Section V(U)[.]" (*Barber I* Compl. ¶ 43.) A claim that the government has violated a plaintiff's substantive due process rights requires conduct "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Estate of Phillips v. District of Columbia*, 455 F.3d 397, 403 (D.C. Cir. 2006) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). Given the kinds of actions that courts have

17

found sufficient to satisfy this standard, it is clear to the Court that the conduct Barber points to here—i.e., the District's alleged "demand" that she resign as an ALJ if she intended to run for judicial office elsewhere, and her eventual removal from her ALJ position—falls far short of the level of misconduct that is required to sustain a substantive due process claim. *See id.* (collecting cases illustrating "[c]onscience-shocking conduct"); *see also, e.g.*, *Lewis*, 523 U.S. at 846 (describing the forced pumping of a suspect's stomach as conduct that offends due process because it "shocks the conscience"). Thus, Barber has failed to state a substantive due process claim on these grounds.

To the extent that Barber's substantive due process claim is based on her belief that Section V(U) of the OAH Code of Ethics ("Section V(U)") is an "unconstitutional, arbitrary and capricious policy" (*see id.* ¶ 43; *see also id.* ¶ 44), any such allegation is a conclusion of law that the court need not accept, *see Hettinga*, 677 F.3d at 476. Moreover, and in any event, Barber's beliefs in this regard are not well founded. Section V(U) provides that

> [a]n Administrative Law Judge shall resign from judicial office when the Administrative Law Judge becomes a candidate either in a party primary or in a partisan general election except that the Administrative Law Judge may continue to hold office, while being a candidate for election to or serving as a delegate in a jurisdiction's constitutional convention, if otherwise permitted by law to do so.

(*Id.* ¶ 16.) This requirement is rationally related to legitimate government interests of "protecting the integrity of the judiciary" and "maintaining the public's confidence in an impartial judiciary." *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015) (internal quotation marks and citation omitted); *see also Morial v. Judiciary Comm'n of State of La.*, 565 F.2d 295, 302–03 (5th Cir. 1977) (upholding a similar rule requiring

state judges in Louisiana to resign before running in partisan elections); *cf. U.S. Civil Serv. Comm'n v. Nat'l Assoc. of Letter Carriers AFL-CIO*, 413 U.S. 548, 580–81 (1973) (rejecting constitutional challenge to Hatch Act's restrictions on government employees' partisan political activities).  And this Court has no doubt that this ethics rule does not violate the substantive due process rights of the ALJs who are subject to it.  If Barber's intent was, instead, to allege that District employees *misapplied* Section V(U), or acted in violation of the procedural protections Barber was entitled to, this Court is bound by D.C. Circuit precedent, which has flatly rejected similar substantive due process claims even under circumstances in which the government has taken action against a plaintiff based on mistaken beliefs and in violation of the law.  *See, e.g.*, *Elkins v. District of Columbia*, 690 F.3d 554, 561–62 (D.C. Cir. 2012); *see also Steinberg*, 901 F. Supp. 2d at 75.

Accordingly, Barber's complaint fails to state a substantive due process claim in any respect, and as a result, the District's motion to dismiss Barber's claim must be granted.

## C.

Count III of *Barber I* claims a violation of Section 1983, insofar as the District allegedly has a "custom or policy" concerning ALJs who seek to run for office that violates the Equal Protection Clause and the Fifth Amendment. (*See Barber I* Compl. ¶¶ 47–51.)  To succeed in a claim for relief under Section 1983, "a plaintiff must prove both (1) a predicate constitutional violation and (2) that a custom or policy of the municipality caused the violation."  *Smith v. District of Columbia*, 306 F. Supp. 3d 223, 241 (D.D.C. 2018) (internal quotation marks and citation omitted).  The "threshold

inquiry" in a Section 1983 suit "requires courts to identify the specific constitutional right at issue." *Manuel v. City of Joliet, Ill.*, 137 S. Ct 911, 920 (2017) (internal quotation marks and citation omitted).

Here, Barber's complaint does not meet this threshold requirement. The relevant count of the complaint cites two constitutional provisions—the Equal Protection Clause of the Fourteenth Amendment and the right to contract that the Fifth Amendment protects. (*See id.* ¶ 48.) The pleading then describes the alleged impact of Section V(U), at least as Defendant Adams has interpreted it. (*See id.* ¶¶ 49–50 ("Defendant Adams'[s] interpretation . . . bars ALJs who do not reside in the District of Columbia, such as Plaintiff Barber, from participating in judicial elections to become judges in states such as Maryland where trial judges are elected and requires ALJs who do run in elections such as the Maryland election for Circuit Court judges to resign from employment or be terminated.").) Barber's complaint asserts that Adams's interpretation renders Section V(U) "unconstitutional on its face, arbitrary and . . . [in]sufficiently justified by government interests" (*id.* ¶ 49), and, in her opposition to the District Defendants' motion to dismiss, Barber baldly alleges that her Section 1983 claim also pertains to a violation of the Privileges and Immunities Clause (*see* Pl.'s Dist. Defs. Opp'n at 27). But Barber has made no attempt to relate the allegations concerning Section V(U)'s alleged impact on ALJs to the *elements* of an equal protection or constitutional contract claim, and when questioned about this at the hearing, Barber's counsel simply stated that it was Barber's intent to allege that Section V(U) "was unconstitutional in the manner in which it was applied[.]" (Hr'g Tr. at 15:24–25.)

Given these myriad constitutional provisions and vague allegations, the Court agrees with Defendants that Barber's Section 1983 claim must be dismissed. "[Barber] provides no explanation of the alleged conflict between [Section] V(U), or any interpretation of it, and any constitutional provision" (Dist. Defs.' Mot. at 18), and it is well established that a complaint that contains legal claims that are divorced from the factual allegations necessary to satisfy the applicable legal standards is subject to dismissal, *see Jiggetts*, 319 F.R.D. at 416–17. Other courts in this district have likewise concluded that generalized statements alleging violations of multiple constitutional provisions without a description of *how* the facts alleged constitute the claimed violations "fail to provide the 'requisite specificity' needed to survive a motion to dismiss." *Voinche v. Obama*, 744 F. Supp. 2d 165, 176 (D.D.C. 2010) (citation omitted).

So it is here. By alleging only that Section V(U) prevents Barber from maintaining her position as an ALJ while running for judicial office elsewhere, without any allegations of fact or citations to law that plausibly explain *why* such a circumstance constitutes a violation of Barber's constitutional rights, Barber's Section 1983 count fails *both* Rule 8's notice requirement *and* Rule 12(b)(6)'s mandate that a complaint state a claim upon which relief can be granted. Consequently, Barber's Section 1983 claim (Count III of *Barber I*) will be dismissed.

## D.

Finally, with respect to the category of constitutional claims, Count IV of *Barber I* alleges that the District and individual defendants Adams, Natale, Nolen, and Jarashow conspired to deprive Barber of "equal protection of the laws[.]" (*See Barber I*

Compl. ¶ 54.)  The thrust of Barber's allegation appears to be that Jarashow "falsely

claim[ed] that [Barber] was running as a Democrat candidate" in the Maryland judicial

election, and that the individual defendants conspired to produce a legal opinion that

mischaracterized the Maryland election as "partisan" in order to influence District

authorities concerning whether Barber's ALJ position should be terminated.  (*Id.*)

Thus, the factual basis for Barber's claim that these defendants violated Section 1985 of

Title 42 of the United States Code, which prohibits conspiracies for the purpose of

depriving individuals of equal protection, appears to be the alleged fact that Jarashow

initiated the actions that led to Barber's termination because he (falsely) intimated she

was running as a Democrat.

> To state a claim under Section 1985,

> > a plaintiff must allege: (1) a conspiracy (2) motivated by 'some
> > racial, or perhaps otherwise class-based, invidiously
> > discriminatory animus' (3) for the purpose of depriving, either
> > directly or indirectly, any person or class of persons of the equal
> > protection of the laws, or of equal privileges and immunities
> > under the laws, and (4) an act in furtherance of the conspiracy (5)
> > whereby a person is either injured in his person or property or
> > deprived of any right or privilege of a citizen of the United States.

*Kelley v. District of Columbia*, 893 F. Supp. 2d 115, 120 (D.D.C. 2012) (quoting *United

Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 828–29 (1983)).  Barber's Section

1985 contention falters from the get-go—i.e., with respect to the first and second

elements of such a claim—and it fails even if one sets aside the complicated question of

whether or not one's status (or perceived status) as a member of a political party

qualifies as a protected class for the purposes of a Section 1985 conspiracy.  (*See* Pl.'s

Dist. Defs. Opp'n at 40–43.)  *See also Scott*, 463 U.S. at 835–37 (withholding judgment

as to whether Section 1985 extends to animus based on political party, views, or

activities); *Hobson v. Wilson*, 737 F.2d 1, 21 (D.C. Cir. 1984) (collecting cases addressing Section 1985's applicability to political animus, but declining "to decide whether purely political . . . activity without any racial overtones falls within [S]ection 1985(3)").

Specifically, Barber's Section 1985 claim is fatally flawed because her complaint is completely devoid of any allegations regarding any defendant's intent to oust her from her job or deny her future opportunities *on the basis of* a protected trait or characteristic, such that her pleading plausibly implicates the right to equal protection or equal privileges under the law. There are no facts in Barber's complaint that suggest that anyone other than Jarashow knew of or even assumed Barber's political party, much less that any other alleged member of the conspiracy could have been motivated by legally actionable animus against that classification. (*See generally Barber I* Compl.) Nor has Barber alleged that the conspiracy was based on any *other* theory of discrimination that might qualify as a denial of equal protection. (*See generally id.*; *see also* Hr'g Tr. at 82:7-8 ("[W]e have not made the assertion in the complaint that there was a racial component[.]").)

Barber's complaint is also entirely silent when it comes to any allegations of fact regarding an actual *agreement* amongst the defendants, which is the essence of a conspiracy; that is, nothing in the complaint even hints at "the existence of any events, conversations, or documents indicating that there was ever an agreement or meeting of the minds" amongst the defendants to violate her rights based on her membership in a protected class. *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 75 (D.D.C. 2007) (internal quotation marks and citation omitted). Barber's assertion of any

agreement at all (*see Barber I* Compl. ¶¶ 54–55) is "conclusory at best[,]" and it is clear that "[c]onclusory allegations of an agreement will not suffice" to support a Section 1985 conspiracy claim at the motion-to-dismiss stage, *Burnett v. Sharma*, 511 F. Supp. 2d 136, 143 (D.D.C. 2007) (collecting cases). Therefore, Barber's Section 1985 claim (Count IV of *Barber I*) will also be dismissed.

## IV.

The last category of claims that Barber brings in the two consolidated complaints consists of two state law tort claims against Jarashow. (*See Barber I* Compl. at 19–22 (Counts VI–VII).) Notably, Barber has brought only three claims against Jarashow overall: the now-dismissed Section 1985 conspiracy claim (*see* Sec. III.D, *supra*); a contract interference claim (*see Barber I* Compl. at 19–21 (Count VI)); and a defamation claim (*see id.* at 21–22 (Count VII)). Thus, the only claims that remain against Jarashow at this point in the Court's analysis are the two tort claims, which have been brought under state law and pertain to Jarashow's alleged conduct with respect to Barber's quest for a judicial position in Maryland.

Barber concedes both that it is within this Court's discretion to "decline to exercise supplemental jurisdiction" over these state law tort claims (Pl.'s Opp'n to Def. Jarashow's Mot., ECF No. 28, at 30 (quoting 28 U.S.C. § 1367(c)(3)), and that, given the circumstances presented here, she would suffer no prejudice if the Court did so (*see* Hr'g Tr. at 24:6–25:13). Based on these concessions, and in light of the early stage of this litigation, this Court will "decline to exercise supplemental jurisdiction" over the tort claims against Jarashow, and as a result, it will grant Jarashow's motion to dismiss

Counts VI and VII of *Barber I*.  28 U.S.C. § 1367(c); *see also Jackson v. Bowser*, No. 18-cv-1378, 2019 WL 1981041, at *11 (D.D.C. May 3, 2019).[8]

**V.**

In sum, and as reflected in the accompanying Order, this Court has addressed Defendants' motions to dismiss with respect to the eleven claims that Barber has made across the consolidated complaints as follows:  Barber's employment claims (*Barber I* Count V; *Barber II* Counts I, II, III, and IV) will be allowed to proceed, except that Count V of *Barber I* will be dismissed as against Natale and Nolen; Barber's constitutional claims (*Barber I* Counts I, II, III, and IV) will be dismissed without prejudice; Barber's oral motion to amend the complaint will be granted as to her procedural due process claim (*Barber I* Count I); and Barber's tort claims against Jarashow (*Barber I* Counts VI and VII) will also be dismissed without prejudice.

Accordingly, the District Defendants' motion to dismiss Counts I, II, III, and IV of *Barber II* is **DENIED**.[9]  The District Defendants' motion to dismiss Counts I, II, III, and IV of *Barber I* is **GRANTED**, and Jarashow's motion to dismiss Counts VI and VII of *Barber II* is also **GRANTED**.  With respect to the remaining claim, Count V of *Barber I*, the District Defendants' motion to dismiss is **GRANTED IN PART AND DENIED IN PART**.  The motion is granted to the extent that it seeks to dismiss Count V of *Barber I* against individual defendants Natale and Nolen, and denied to the extent

---

[8] To be clear, although Barber's federal claims arising out of her alleged mistreatment by the District and Adams during the course of her employment as an ALJ remain (*see* Sec. III, *supra*), Jarashow's alleged conduct has nothing to do with those claims and is not implicated in those counts. Consequently, the Court's dismissal of the Section 1985 claim (*see* Sec. III.D, *supra*) eliminates the only federal-law basis for this Court's exercise of subject matter jurisdiction over the claims against Jarashow.

[9] District Defendants have not moved for dismissal of these claims against Adams in his individual capacity.  (*See* Dist. Defs.' Mot. at 21–23; *see also id.* at 7 n.3, 13 n.10.)

that it seeks to dismiss Count V of *Barber I* against the District and Adams based on Barber's January 2016 allegedly protected disclosure and Adams's subsequent allegedly retaliatory conduct.

Date:  August 13, 2019

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge