**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CLAUDIA A. BARBER | |
| *Plaintiff*, | |
| v. | Civil Action No. 1:17-cv-00620-KBJ |
| DISTRICT OF COLUMBIA, *et al.*, | |
| *Defendants*. | |

<u>**DEFENDANTS' REPLY IN FURTHER SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**</u>

## TABLE OF CONTENTS

INTRODUCTION………………………………………………………………………...1

ARGUMENT…………………………………………………………………………...2

    I.     Exhaustion of Plaintiff's Title VII Claims (Count III and IV)……………………2

    II.    Plaintiff's Race and Color Discrimination Claims (Count I and III) Fail...………3

        A.    Promotion to PALJ……………………………………………………..3

        B.    Assigning Handy Over DCRA Jurisdiction………..…………………...5

        C.    Goodie's Selection…..…………………………………………………6

        D.    Alleged Denied Access to COST/July 13, 2016 Invite to Meeting……….6

        E.    Adams' Removal of Plaintiff………………………………………...7

        F.    Termination Without Exit Interview………………………………8

        G.    Alleged False Statements to Unemployment Claims Adjuster…………8

        H.    September 2016 Ethics Charges ……………………………………9

        I.    Denial of August 8, 2016 Grievance………………………………9

        J.    Offer During June 1, 2015 EEO Mediation…………………………...10

        K.    Causation…………………………………………………………10

III.    The District is Entitled to Judgment on Plaintiff's Retaliation Claims (Counts II and IV)………………………………………………………………………...11

        A.    Plaintiff Concedes Her Title VII Retaliation Claim……………………11

        B.    Plaintiff's DCHRA Retaliation Claim Fails……………………………11

            1.    Protected Disclosure………………………………………11

            2.    Adverse Actions………………………………………13

            3.    Causation………………………………………………15

IV.    Plaintiff DCWPA Claims Fail as a Matter of Law………………………………16

V.    The District Had Legitimate Reasons to Terminate Plaintiff's Employment………..…17

i

CONCLUSION…………………………………………………………………………………..18

## **<u>TABLE OF AUTHORITIES</u>**

**Cases**

*Akonji v. Unity Healthcare, Inc.*, 517 F. Supp. 2d 83, 95 (D.D.C 2007)………………………...13

*Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 72 (D.D.C 2011)……………………………17

*Griggs v. Duke Power Company*, 401 U.S. 424 (1971)………………………………………….4

*Grosdidier v. Broad. Bd. of Governors, Chairman*, 709 F.3d 19 at 25 (D.C. Cir. 2013)…………3

*Hamilton v. Geithner*, 666 F.3d 1344, 1357-58 (D.C. Cir. 2012)………………………………..14

*Jones v. Castro*, 188 F. Supp. 3d 169 (D.D.C. 2016)……………………………………….7, 13

*Wilburn v. District of Columbia*, 957 A.2d 921 (D.C. 2008)……………………………………18

*Walden v. Patient-Centered Outcomes Research Institute*, 177 F. Supp. 3d 336, 342 (D.D.C. 2016)……………………………………………………………………………………………2

**Statutes**

42 U.S.C. § 2000*e, et seq.*,………………………………………………………………………...1

D.C. Code § 2-1401.01, *et seq*…………………………………………………………………….1

## <u>INDEX OF EXHIBITS</u>

| Exhibit | Description |
|---------|-------------|
| 16 | Plaintiff's Answer to Interrogatory No. 10 |
| 17 | Defendants' Request for Production of Documents |
| 18 | Defendants' Deficieny Letter 3/9/2020 |
| 19 | Defendants' Deficieny Letter 5/28/2020 |

## INTRODUCTION

Plaintiff's Opposition is fraught with arguments that are simply unsupported by the record of evidence and case law.  Plaintiff's discrimination, retaliation, and whistleblower claims rest on a mound of speculation and conjecture.  Plaintiff spends the overwhelming majority of her brief attempting to cast doubt on the District's legitimate non-discriminatory/non-retaliatory reasons for her termination.  But, Plaintiff's Opposition amounts to nothing more than revisionist history after she made an ill-advised decision to run in a partisan election in violation of the Office of Administrative Hearings (OAH) Code of Ethics, which resulted in her termination from an Administrative Law Judge (ALJ) position.  As a practicing ALJ for a decade, she possessed the legal acumen to know and understand that her choice of running in a partisan election was a violation of the code of ethics and could result in termination.  Plaintiff now wants the Court to believe that she spent ten years working in a racially hostile environment—a claim that is not viable—where "dark-skinned" African-Americans were subjected to disparate treatment; however, she cannot point to any disputed material fact to support a *prima facie* case for any of her allegations.  Instead, she provides jumbled timelines for frivolous claims with conclusory statements —unsupported by the record—that fail to show *prima facie* cases for:  (1) race/color discrimination under Title VII or the DCHRA; (2) retaliation under Title VII or the District of Columbia Human Rights Act (DCHRA); or (3) violation of the District of Columbia's Whistleblower Protection Act (DCWPA).  Ultimately, in an attempt to defend her actions, Plaintiff concedes that multiple sources revealed her actions would be improper.  Further, and more importantly, she does nothing to prove the District's reasons for her termination were pretext for unlawful discrimination or retaliation.  Thus, her claims fail as a matter of law and the Court should enter judgment for Defendants.

1

**ARGUMENT**

**I.      Exhaustion of Plaintiff's Title VII Claims (Count III and IV)**

Plaintiff failed to provide copies of her Right to Sue letters for her EEOC cases to

Defendants in discovery.  On December 30, 2019, the District propounded requests for

production of documents (RPD) to Plaintiff.  Defs.' Req. Produc. Docs. at 2, attached as Defs.'

Ex. 17.  RPD Nos. 3 and 4 specifically asked for all documents identified or relied upon for

drafting charges of discrimination to the United States Equal Employment Opportunity

Commission (EEOC) and all documents submitted to or received from the EEOC but not limited

to the District of Columbia Office of Human Rights.  *Id.*  Plaintiff failed to respond to the RPD

request pursuant to the court order by January 30, 2020.  Defs.' Deficiency Letter dated March 9,

2020, attached as Defs. Ex. 18.  Plaintiff responded on April 15, 2020, with essentially a

document dump of 1,000 pages that did not contain the right to sue letters.  Defs. Deficiency

Letter dated May 28, 2020, attached as Defs. Ex. 19.  The District responded by sending a letter

stating Plaintiff still had not provided the correct EEO documents in response the RPD request.

On June 30, 2020, the District contacted the Court who ordered Plaintiff to properly respond to

the District's requests.  Plaintiff still failed to produce the right to sue letters.  Plaintiff's failure

to provide documents related to the EEO claim led Defendants to believe that she had not

exhausted all of her administrative requirements and thus argued the point in their motion for

summary judgment.

However, Plaintiff's Exhibit 1 attached to her Opposition—which she failed to produce

to Defendants in discovery—reveals Notice of Right to Sue Letters for complaints filed on

March 9, 2015 (10C-2015-00261) and August 26, 2016 (10C-2016-006667).  As such, the issue

regarding exhaustion is moot.

**II.**     **Plaintiff's Race and Color Discrimination Claims (Count I and III) Fail.**

It is undisputed that, as a dark-skinned African-American, Plaintiff qualifies as a member of a protected class.  Indeed, Defendants did not dispute this in their summary judgment brief. Plaintiff argues that ten alleged actions qualify as adverse employment actions in support of her discrimination claims.  However, Plaintiff makes her arguments with either no record or case law support.  As further shown below, the alleged actions did not result in "materially adverse" consequence affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact might find objectively tangible harm."  *See Walden v. Patient-Centered Outcomes Research Institute*, 177 F. Supp. 3d 336, 342 (D.D.C. 2016) (quoting *Douglas v. Donovan*, 559 F.3d 549, 552 (D.C. Cir. 2009)).

**A.**     **Promotion to PALJ**

Plaintiff's first contention is that she was not promoted to a Principal Administrative Law Judge (PALJ) position over lesser qualified Caucasian or lighter-skinned African-American ALJs during her tenure at OAH by CALJ Tucker.  Pl.'s Opp'n [68] at 21.[1]  In each instance where a Caucasian ALJ was promoted to PALJ, Plaintiff's reflexive response—without any record or factual support—is that the Caucasian was less qualified because Plaintiff had greater tenure.  *Id.* at 8, 21-22.  Plaintiff, however, does not show or prove how she had greater qualifications than those selected—i.e., either through Continuing Legal Education (CLE) classes, receiving certifications in areas that PALJs oversee, expertise in a particular field, superior writing abilities, that she holds a higher degree, or in any other manner.  Her sole rationale—again without any record support—is that she has more seniority.  "To prevail on a

---

[1]     Defendants cite to the Bates Stamped pages at the top of Plaintiff's Opposition when citing to page numbers herein.

relative qualifications claim, [a plaintiff] must show that she is '*significantly better'* qualified for

the job than [the applicant] ultimately chosen." *Grosdidier v. Broad. Bd. of Governors,*

*Chairman*, 709 F.3d 19 at 25 (D.C. Cir. 2013).  Here, Plaintiff has simply failed to provide any

record or factual support for her claim that other less-qualified individuals were hired over her.

*See generally* Pl.'s Opp'n [68].

One aspect of the PALJ position that could be considered advantageous was the

additional $3,000 in salary.  Pl.'s. Ex. 34 ¶ 10.  However, is it undisputed that when CALJ

Tucker assumed her position in February 2014, she had stopped the $3,000 increase for PALJs.

Pl.'s. Ex. 34 ¶ 10.  CALJ Tucker viewed the PALJ position as more of an administrative role not

warranting higher pay.  Defs. Ex. 3 at 10-11.  So, it is undisputed that the individuals who were

selected over Plaintiff did not receive this increase.  And, even if Plaintiff was selected, she also

would not have received an increase in pay.  Thus, her non-selection to the PALJ position does

not qualify as an adverse action.

Plaintiff has melodramatically labeled an email sent to all ALJs by CALJ Tucker on

February 2, 2015, as an adverse action described as a "literacy test" meant to exclude African-

Americans from applying for PALJ positions.  Pl.'s Opp'n [68] at 11; Pl.'s Ex. 3S.  A review of

the email clearly shows that CALJ Tucker provided a list of attributes that a successful PALJ

should possess based on consultation with other PALJs.  Pl.'s Ex. 3S.  The brief email is quite

distinguishable from Plaintiff's citation to *Griggs v. Duke Power Company*, 401 U.S. 424 (1971).

Pl.'s Opp'n [68] at 28.  *Griggs* dealt with a company administering two professionally prepared

aptitude tests - the Wunderlich Personnel Test and the Bennett Mechanical Comprehension Test.

*Id.* at 428.  Neither test had any relation to the jobs at the company and were solely utilized to

disproportionally disqualify African-American applicants to positions within the company that

had been historically designated for Caucasian employees prior to the passage of the Civil Rights Act of 1964.  The Court held that tests of this nature that were unrelated to actual job requirements were a violation of the Civil Rights Act.  CALJ Tucker's simple email with bullet points many of which began with the phrase "Ability and willingness to . . . ," does not ask a question and has no comparison to the professionally-prepared and racially motivated intelligence tests described in *Griggs*.  Pl.'s. Ex. 3S.

And, it is important to note that CALJ Tucker instituted this requirement for *all* PALJ applicants, not just toward African-Americans.  Pl.'s Ex. 3S.  And it certainly did not discourage African-Americans from applying given that Plaintiff, a dark-skinned African-American, concedes that she applied for the position.  *Id.*

### B.      Assigning Handy Over DCRA Jurisdiction

Plaintiff contends that the promotion of ALJ Paul Handy, a Caucasian male, to oversee DCRA matters September 2015, instead of herself or another dark-skinned ALJ named Audrey Jenkins was an adverse action by CALJ Adams.  Pl.'s Opp'n [68] at 21.  Plaintiff provides no context as to what the responsibilities of the position entailed; nor does she state or provide evidence that the other dark-skinned ALJ Jenkins actually applied for the position.  Instead, Plaintiff reflexively compares length of service dates, stating that she had ten years of experience with DCRA as a client jurisdiction over Handy who arrived in mid-2015.  *Id.*  Plaintiff fails, once again, to show that her qualifications for DCRA matters were superior to PALJ Handy.  As such, this cannot be considered an adverse action.

### C.      Goodie's Selection

ALJ Sharon Goodie, a Caucasian female, was chosen as a PALJ to oversee the Public Benefits jurisdiction in February 2016.  Pl.'s Opp'n [68] at 21.  Plaintiff asserts that Goodie had

less tenure at OAH and less experience with public benefits cases.  Plaintiff claims this selection

was discriminatory, abnormal, and highly suspect, since Goodie was Caucasian.  *Id.*  Plaintiff

neglects to state that she was already placed on administrative leave for the OAH Code of Ethics

violation when ALJ Goodie was selected for the PALJ position on February 12, 2016, as she

stated in her deposition.  Defs. Ex. 1 at 27.  Thus, because Plaintiff was ineligible for the PALJ

position at the time of selection, this does not constitute an adverse action.  Defs. Ex. 1 at 27.

Furthermore, while other dark-skinned ALJs are mentioned, Plaintiff offers no proof that these

individuals had superior qualifications or that they even sought the PALJ position.

    **D.**    **Alleged Denied Access to COST/July 13, 2016 Invite to Meeting**

       Plaintiff contends that a meeting on July 13, 2016, convened by COST Chair, Superior

Court Judge Yvonne Williams, was some sort of clandestine meeting to deny her due process

rights before her removal hearing with the COST, and thus qualifies as an adverse action.  Pl.'s

Opp'n [68] at 24.  The document to which Plaintiff cites in support of this position is her Exhibit

13.  *Id.*  A review of the exhibit shows an email from COST Chair Judge Williams to other

COST members, copying Vanessa Natale along with Shawn Nolen, OAH staff members who

support the COST administratively.  *Id.*  The email states that a hearing would be held at 10:30

a.m. but she wanted to meet before the hearing at 10 a.m.  *Id.*  This exhibit is merely one-

sentence email without any other information.  *Id.*  Plaintiff wants this Court to somehow believe

this email shows a plot to deny Plaintiff's due process rights before a hearing scheduled to occur

30 minutes later.  This is nothing more than a preposterous allegation with no other evidence to

support the outlandish accusation.  Furthermore, Plaintiff identifies one person on the email,

Louis Neal, as a member of the prosecution team that supposedly attended the meeting and the

email was not even addressed to him.  A totally unfounded accusation that cannot be considered

an adverse action.

### E.      Adams' Removal of Plaintiff

On February 12, 2016, Plaintiff was placed on paid administrative leave for allegedly violating the OAH Code of Ethics pending a review by the COST.  Defs. Ex. 5.  Plaintiff contends this was unauthorized and qualifies as an adverse action.  D.C. Personnel Manual § 3741 titled Summary Suspension of an Administrative Law Judge states in § 3741.1 that the Chief Administrative Law Judge may summarily suspend an Administrative Law Judge without pay if there is a cause for discipline or removal pursuant to § 3729, which includes conduct violations.[2]  In this instance, Plaintiff was placed on paid administrative leave on February 12, 2016 (a lesser imposition), and advised that she had until February 16, 2015, to submit her resignation or CALJ Adams would refer the matter to the COST recommending her termination for violation of the OAH Code of Ethics.  Pl.'s Ex. 11.  Despite Plaintiff's unsupported contention, paid administrative leave is not an adverse action.  *Jones v. Castro*, 188 F. Supp. 3d 169 (D.D.C. 2016) (court held that a 19 month period of paid administrative leave while an investigation is ongoing—an initial two-week period followed by periodic extensions—does not, by itself, constitute an adverse action).  Here, Plaintiff was on paid administrative leave for a total of five months before the COST determined she had violated the OAH Code of Ethics.  Pl.'s Opp'n [68] at 18.  Plaintiff's placement on paid administrative leave does not qualify as an adverse action and Plaintiff cites no authority to the contrary.

### F.      Termination Without Exit Interview

---

[2]      D.C. Personnel Manual § 3729 - Cause to discipline or remove an Administrative Law Judge under the Act includes any of the following:  Willful misconduct in office, violation of applicable law or rules, including without limitation, any violation of code of profession responsibility applicable to the Administrative Law Jude pursuant to section 8(a)(9) of the Act, D.C. Official Code § 2-1831.05(a)(9).

Plaintiff claims that her termination without an exit interview as an adverse action

primarily because she was not advised of continued medical health insurance care under

Consolidated Omnibus Budget Reconciliation Act (COBRA).  Pl.'s Opp'n [68] at 25.  An exit

interview is not a material change in employment.  *See Walden*, 177 F. Supp. 3d at 342.  And

Plaintiff cites no authority requiring that OAH hold an exit interview, especially for an employee

who has been terminated.  *See* Pl.'s Opp'n [68] at 25.  Plaintiff also provides no caselaw to

support that termination without an exit interview qualifies as an adverse action.  *See id.*  Thus,

there is no basis for this Court or a jury to find that this qualifies as an adverse action in support

of Plaintiff's discrimination claim.

### G.  Alleged False Statements to Unemployment Claims Adjuster

Plaintiff also claims that CALJ Adams and OAH General Counsel provided false

statements to the unemployment claim adjuster.  Pl.'s Opp'n [68] at 25.  Plaintiff cites Exhibit

21, which is a letter from the District Department of Employment Services.  The letter states that

the Plaintiff was denied unemployment because she was discharged for misconduct.  *Id.*  The

letter goes on to state that since the employer had not responded, she was granted unemployment

benefits as of July 13, 2016.  *Id.*  Fundamentally, the document does not prove that Adams or

OAH's General Counsel provided any statements, let alone false statements.  Regardless,

Plaintiff was provided the unemployment benefits, so there was no harm.  And further, because

Plaintiff was no longer employed at OAH, this cannot be deemed an adverse action  *See Walden,*

177 F. Supp. 3d at 342.

### H.  September 2016 Ethics Charges

Plaintiff contends that frivolous ethics charges were filed against her by CALJ Adams

and OAH's General Counsel in September 2016, with the District of Columbia Bar Counsel and

the Maryland Attorney Grievance Commission with the sole intent of having Plaintiff disbarred.

Pl.'s Opp'n [68] at 25.  However, her only citation to the record is election materials that show

she was fired from her judicial position.  Pl.'s Ex. 22, 28.  It is important to recognize that

Plaintiff had already been terminated at the time Adams allegedly provided this information to

the D.C. Bar.  Thus, any such act—even if true—cannot qualify as adverse action because it did

not result in a materially affect the terms, conditions, and privileges of Plaintiff's employment.

*See Walden,* 177 F. Supp. 3d at 342.  Even more fundamentally, the exhibits cited—Pl.'s Exs. 22

and 28—are election campaign flyers; they certainly do not prove that Adams and his General

Counsel provided frivolous ethics charges or false information to anyone.

## I.     Denial of August 8, 2016 Grievance

On August 8, 2016, Plaintiff received a letter from OAH General Counsel regarding the

interpretation of the District of Columbia Personnel Policy and Procedure Manual, which she

contends was an adverse employment action.  Pl.'s Opp'n [68] at 26.  Plaintiff cites Exhibit 23,

which Plaintiff represents is a letter from the Office of Administrative Hearings dated August 7,

2016.  *Id.*  The actual date of the letter is not visible on the exhibit.  *Id.*  The letter denies

Plaintiff's grievance regarding "ex parte" communications between members of the COST in

violation of Rules 3.4 and 3.5 of the Rules of Professional Conduct as well as various violations

of sections in the District of Columbia Municipal Regulations (DCMR).  *Id.*

Plaintiff characterizes the letter as the OAH General Counsel stating that the District of

Columbia Personnel Policy and Procedure Manual did not apply to ALJs.  Pl.'s Opp'n [68] at 26.

However, the letter actually states that Plaintiff had identified the wrong section of the manual.

Pl.'s Ex. 23.  The General Counsel specifically stated that Plaintiff mistakenly referenced

Chapter 16 of the DCMR, when the correct chapter that applied to ALJs was Chapter 37.  *Id.*

Plaintiff's accusation is legally incorrect, and she provides no other authority or argument for why this qualifies as an adverse action.

**J.**     **Offer During June 1, 2015 EEO Mediation**

Plaintiff's tenth alleged adverse action in support of her discrimination claim relates to CALJ Adams' actions during a June 1, 2015 EEO mediation. Pl.'s Opp'n [68] at 26. Plaintiff alleges that CALJ Adams demanded she resign and accept a monetary offer with no other options. *Id.* First, mediation sessions are confidential and cannot form the basis for an adverse action. *See* https://ohr.dc.gov/page/mediation-fact-sheet (providing that mediations are confidential); *Walden*, 177 F. Supp. 2d at 342. Second, the only evidence that Plaintiff cites in support of this contention is an email apparently mentioning the June 1, 2015 mediation. This email is inadmissible hearsay and does not support Plaintiff's contention that CALJ Adams made any demands during that mediation. Without any record evidence or any case law, there is no basis for this Court to find that the July 1, 2015 mediation qualifies as an adverse action.

**K.**     **Causation**

Even assuming *arguendo* that any of the above actions qualify as adverse employment actions—and they do not—Plaintiff has not proved that they occurred because of her race or color. *See generally* Pl.'s Opp'n [68] at 20-26.

Plaintiff makes unfounded conclusory arguments that race or color were a determining factor in each of the alleged adverse actions above. Nowhere does she cite in the record that individuals of other races or skin complexions outside her protected class who were similarly situated to her received more favorable treatment. *See Dobbs v. Roche*, 329 F. Supp. 2d 33, 44 (D.D.C. 2004), citing *Holbrook v. Reno*, 196 F.3d 255, 261 (D.C. Cir. 1999).

Ultimately, for the foregoing reasons, Plaintiff cannot make out a prima facie case for her

discrimination claims.  Thus, the Court should enter judgment in favor of the District on Counts I and III.

**III.**   **The District is Entitled to Judgment on Plaintiff's Retaliation Claims (Counts II and IV).**

    **A.**   **Plaintiff Concedes Her Title VII Retaliation Claim.**

In her Opposition, Plaintiff solely addresses her DCHRA retaliation claim.  In its motion, the District argued that Plaintiff cannot establish a prima facie case of retaliation under *Title VII or the DCHRA*.  Def. Mot. Summ. J. [62] at 23-34.  Plaintiff thus conceded the District's Title VII arguments.  Pl.'s Opp'n [68] at 29-32.  The Court should therefore enter judgment for the District on Plaintiff's Title VII retaliation claim (Count IV).

    **B.**   **Plaintiff's DCHRA Retaliation Claim Fails.**

        **1.   Protected Disclosure**

Plaintiff's Opposition brief contends that there were two protected disclosures during her tenure as an ALJ.  Pl.'s Opp'n [68] at 29.  The first was her November 7, 2014 email to Acting CALJ Tucker seeking clarity on a perceived racial disparity in case assignments between African-American and Caucasian ALJs.  *Id.*  The second was Plaintiff's informal counseling which involved her and CALJ Tucker meeting with an EEO Counselor to discuss Plaintiff's case.  *Id.*, Pl's. Ex. 3U.  To constitute a protected activity, a complaint must allege an employment practice that is prohibited by the DCHRA.  *Vogel v. D.C. Office of Planning*, 944 A.2d 456, 464 (D.C. 2008).

A review of the November 2014 email shows Plaintiff's attempted sarcasm or perhaps an attempt at witty banter to describe the distribution of so-called "complex legal cases."  Pl.'s Ex. 3A.  The email contains a comment where Plaintiff states she believes Judge Sharkey perceives white judges as more intelligent to handle complex cases than black judges.  In addition, Plaintiff

cites to an eCourt report listing cases for ALJs as "concrete proof" of the racial disparity in the distribution of cases. Pl.'s Opp'n [68] at 30. The eCourt report shows a total of nine cases that are labeled with the abbreviation "DSLBD", which stands for Department of Small and Local Business Development. Pl.'s Opp'n [68] at 9. The filing dates and the ALJs that were assigned to the cases from November 6, 2014, until April 20, 2015, are identified. The period for the report is six months. Pl.'s Ex. 3U. Plaintiff Barber was assigned a DSLBD case titled *Department of Small and Local Business Development vs. Balfour Beatty* in November 2014, the same month she sent the email to CALJ Tucker with a perceived concern about the assignment of complex cases. *Id.* After November 2014, the report reflects that the amount of DSLBD cases is essentially one case per month. *Id.* Aside from the fact that Plaintiff offers no analysis or mechanism to determine exactly what a complex case entails; there is no material evidence to show a massive volume of cases were being assigned to a particular racial group. This this email cannot considered a protected activity. *Id.*

Turning to Plaintiff's second contention that a counseling with CALJ Tucker regarding her EEO complaint was a protected activity, Pl.'s Opp'n [68] at 30, it is undisputed that the filing of an Equal Employment Opportunity Commission (EEOC) charge on March 9, 2015, against CALJ Tucker, which resulted in CALJ Tucker meeting with an EEO Counselor to discuss the case was a protected activity. Pl.'s Opp'n [68] at 30. However, this complaint was voluntarily withdrawn by Plaintiff, stating that the PALJ positions had been opened up to anyone interested after CALJ Tucker had sent an email to all ALJs listing the attributes of the position. Defs.' Ex. 7. Clearly, the withdrawal of the complaint shows there was no protected activity because Plaintiff was satisfied with CALJ Tucker's actions opening up the PALJ positions to everyone, which had not previously been done by other CALJs.

12

### 2.    Adverse Actions

Plaintiff cites no record evidence and minimal caselaw to support her argument that she suffered an adverse action in support of her retaliation claim.  *See* Pl.'s Opp'n [68] at 30-31.

Plaintiff's Opposition identifies the following adverse actions:  (1) CALJ Tucker's destruction of Plaintiff's responses to the so-called "literacy test" and supporting writing samples; (2) CALJ Tucker's failure to provide proof that CALJ Adams received Plaintiff's responses to Tucker's literacy test; (3) CALJ Tucker's refusal to tell CALJ Adams that she had created a "literacy test," as part of the application criteria used to appoint the next PALJ; (4) CALJ Adams refusal to follow personnel policy and procedures under 6B DCMR 3734.6 by placing Plaintiff on immediate administrative leave before notifying the COST; (5) CALJ Adams refusal to allow Plaintiff to meet with COST as allowed under personnel rules; (6) CALJ Adams refusal to follow the Open Meetings Act when discussing Plaintiff's case by conducting numerous off the record conversations about Plaintiff's case; (7) providing COST members a false narrative and new interpretation of the Code of Ethics not known to Plaintiff so that he could pursue the severest penalty allowed of removal; and (8) filing of frivolous bar complaints against Plaintiff.  Pl.'s Opp'n [68] at 30-31.

The deluge of accusations above that are supposedly adverse actions can be summed up in two words—legally incorrect.  Plaintiff cannot point to a material fact in the record that reveals any of the above actions amount to a tangible employment action.  *See Akonji v. Unity Healthcare*, Inc., 517 F. Supp. 2d 83, 95 (D.D.C. 2007).  Initially, as noted above, CALJ Tucker's email on February 2, 2015, listing attributes for a PALJ is clearly distinguishable as not being a "literacy test."  Although Plaintiff sent CALJ Tucker an application packet for a PALJ position with annotations concerning the email from February 2, 2015; the record clearly

indicates that, in April 2015, CALJ Adams was appointed.  Defs. Ex. 5 at 29.  Just like CALJ Tucker, he implemented his own hiring practices for PALJs and was not under any requirement to follow the previous policies of Acting CALJ Tucker, thus adverse actions (2) and (3) are moot.

With regard to the accusations of adverse employment actions committed due to CALJ Adams communication with the COST, Plaintiff's contentions are simply wrong.  As discussed above, CALJ Adams had the authority to place an ALJ on administrative leave.  Furthermore, administrative leave is not an adverse action.  *Jones v. Castro*, 188 F. Supp. 3d 169 (D.D.C. 2016) (court held that a 19-month period of paid administrative leave while an investigation is ongoing – an initial two-week period followed by periodic extensions – does not, by itself, constitute an adverse action).  Here, Plaintiff was on paid administrative leave for five months pending the COST's termination decision for her underlying ethics violation.  Pl.'s Opp'n at 18.

Additionally, CALJ Adams was a non-voting member of the COST.  Therefore, his communications were not *ex parte*; as such, arguments (4), (5), (6) and (7) are meritless.  CALJ Adams did not have control over the COST to prevent a meeting with Plaintiff; any discussions that CALJ Adams had with COST members were in the performance of his duties as a member of the COST; and the COST conducted an investigation where the Commission determined a Code of Ethics violation had occurred.  Defs. Ex. 6.  And, in fact, CALJ Adams did not vote to terminate Plaintiff.  *Id.*

The last accusation regarding CALJ Adams and OAH filing frivolous bar complaints against Plaintiff cannot be considered an adverse action because the Plaintiff was no longer employed with OAH.  The bar complaints were filed on September 26, 2016, following Plaintiff's termination on July 13, 2016.  Pl.'s Ex. 15.

14

Based on the above, Plaintiff has failed to show evidence that an adverse action occurred while employed with OAH as an ALJ.

### 3.    Causation

Even assuming *arguendo*, that Plaintiff made a protected disclosure and experienced adverse employment actions, she cannot show that any of the actions were causally related to her protected activity.  Plaintiff concedes that she must show but-for causation for her retaliation claims.  *See* Pl.'s Opp'n [68] at 31-32 (citing *Nassar*, 570 U.S. at 364).  But Plaintiff's claims fail for lack of temporal proximity and decisionmaker knowledge.

Plaintiff's main argument regarding causation has been her non-selection for a PALJ position after her email highlighting the perceived racially motivated distribution of cases to CALJ Tucker in November 2014.  Pl.'s Ex. 3S.  She claims that CALJ Adams did not select her for PALJ positions in 2015 and 2016, after this alleged disclosure to Tucker.  *See* Pl.'s Opp'n [68] at 32.  But, these non-selections occurred more than three months after Plaintiff's disclosure to Tucker.  *See Hamilton v. Geithner*, 666 F.3d 1344, 1357-58 (D.C. Cir. 2012) ("three months is perceived as approaching the outer limit" to establish a causal connection between a protected activity followed by an adverse action).  And Plaintiff cites no records evidence that CALJ Adams was aware of her November 2014 disclosure to Tucker.  *See* Pl.'s Opp'n [68] at 32.

And all of the other adverse actions—to the extent they even qualify—are well beyond three months from her alleged protected disclosures and thus are too remote to prove causation.

Based on the above, Plaintiff has failed to produce any competent evidence to support a *prima facie* case of retaliation claim under Title VII or DCHRA.  As such, the Court should enter judgment in favor of the District on Plaintiff's retaliation claims in Counts II and IV.

### IV.    <u>Plaintiff's DCWPA Claim Fails as a Matter of Law.</u>

Plaintiff's opposition gives short-shrift to her DCWPA claim.  *See* Pl.'s Opp'n [68] at 36-38.  Plaintiff admits that her only real protected disclosure was an email to the Office of the Inspector General hotline on February 21, 2016.  But, as Plaintiff concedes, this cannot support her DCWPA claim because the protected disclosure came *after* Defendant Adams's decision to place Plaintiff on administrative leave for her ethics violation.  *See* Pl.'s Opp'n [68] at 36; *see also Reshard v. Lahood*, 87-cv-2794 (RBW), 2010 WL 1379806, *16 (D.D.C. April 7, 2010) ("It is axiomatic that a plaintiff engage in statutorily protected activity before an employer can retaliate against her for engaging in the protected activity.") (quoting *Durkin v. City of Chicago*, 341 F.3d 606, 614-15 (7th Cir. 2003)).

Plaintiff also makes no attempt to prove how this alleged disclosure—that CALJ Adams wasted tax payer dollars in September 2015, by allowing Caucasian ALJs to not attend mandatory diversity training—qualifies under any of the categories delineated in D.C. Code § 1-615.52(6)(A)-(E).  *See Wilburn v. District of Columbia*, 957 A.2d 921 (D.C 2008).  That is because it does not qualify under any of the protected categories.

Notably, Plaintiff also claims to have sent anonymous emails to the OIG in 2015 reporting abuse of authority, waste, or fraud at OAH.  However, Plaintiff cites no record evidence in support of these alleged disclosures.  Pl.'s Opp'n [68] at 36.  That is because there is no record evidence of the disclosures.  The 2015 disclosures are also too remote in time from her placement on administrative leave and termination.  *See e.g., Johnson v. District of Columbia*, 225 A.3d 1269, 1279 n.11 (D.C. 2020) (identifying "paucity of facts in the record," including plaintiff-employee's failure to supply a date for the alleged disclosure, as grounds for finding no prima facie case of DCWPA violation."); *see also Johnson v. District of* Columbia, 935 A.2d 1113, 1120 (D.C. 2007) (protected disclosures too remote in time from plaintiff's separation not

sufficient for temporal proximity in support of prima facie case of causation under DCWPA). Further, there is no evidence that Adams or any of the COST members were aware of her 2015 anonymous disclosures. *Id.*

Because Plaintiff cannot establish a prima facie case under the DCWPA, Defendants are entitled to judgment on her claim in Count V.

**V.       The District Had Legitimate Reasons to Terminate Plaintiff's Employment.**

Plaintiff Barber was terminated for violating Section V(U) of the OAH Code of Ethics after a hearing with the COST on July 13, 2016.  Defs. Ex. 6.  Plaintiff's opposition brief clearly shows that Plaintiff was fully aware of the OAH Code of Ethics rule against ALJs running in partisan elections.  Pl.'s Opp'n [68] at 13-14.  Plaintiff's actions demonstrated that she knew the policy existed and sought to circumvent the policy to run in an election for a judicial seat.  *Id.* Plaintiff initially sought an anonymous advisory opinion by approaching ALJ Harmon, a member of the OAH Ethics Committee.  *Id.*  The panel refused to provide an anonymous opinion without further information; however, ALJ Harmon provided Plaintiff a copy of specific pages from the ABA Model Commentary on Code of Ethics for Judges, which stated that there was no "resign-to-run" rule when a judge sought an elected judicial position while simultaneously holding another judicial position.  Pl.'s. Ex. 7.

Conveniently, Plaintiff only provides the ABA Model Rule pages in her exhibits list; however, she does not include in her 418 pages of exhibit information the actual response from ALJ Harmon; which stated that an ALJ could not run in Maryland's "partisan primary" because it was an ethics violation.  Pl.'s Opp'n [68] at 13-14.  Plaintiff found ALJ Harmon's answer unacceptable.  She then emailed the Chair of the COST, Superior Court Judge Yvonne Williams, asking for a clarification on whether or not an ALJ could run in an election for a judicial vacancy

without resigning as an ALJ on December 8, 2015.  Pl.'s Ex. 8.  Specifically, noting the conflict between Cannon 4 of the Annotated Model Code of Conduct, that judges need not resign when seeking another judicial position in comparison to Section V(U) of the OAH Code of Ethics, which required an ALJ to resign.  *Id.*  Judge Williams directed Plaintiff to the Board of Ethics and Governmental Accountability (BEGA).  *Id.*  Plaintiff then emailed the General Counsel for BEGA on December 18, 2015, who responded that "The Ethics Act would not prohibit an ALJ from running for judicial office in an election that is not regulated by the District of Columbia Board of Elections."  However, he concluded the email by stating "[w]e cannot opine on whether running for judicial office would comport with any OAH rules that apply to ALJ's or the application of the DC Bar's Rules of Professional Conduct.  Those authorities are not within our jurisdiction."  *Id.*

BEGA's response could not have been more clear in stating that the OAH Code of Ethics was binding and that BEGA lacked jurisdiction over any such policies enacted by OAH.  As an ALJ rendering decisions and interpreting statutory regulations for a variety of OAH cases for ten years, Plaintiff surely understood that OAH policies were applicable regarding her employment.  Furthermore, she knew the COST had the final authority to determine if she would be terminated and that is why she sent a final email to Judge Williams on December 31, 2015.  *Id.*  The email stated that she had received a response from BEGA that provided the "parameters" to seek a judicial vacancy and wanted reassurance from the COST that she would not be forced to resign as an ALJ due to Section V(U).  *Id.*  Notably, she left out ALJ Harmon's declaration that she *could not* run in a partisan judicial election.  Judge Williams did not respond to the final email inquiry.  At that point, Plaintiff made her ill-advised decision to declare her candidacy for a Judge of the Circuit for Anne Arundel County, Maryland on January 20, 2016.  Pl.'s Ex. 9.  A

decision that she unequivocally knew could lead to her termination.

Furthermore, Plaintiff lacks the key understanding to the configuration of the COST and the relationship with former Chief Administrative Law Judge Eugene Adams.  CALJ Adams was a non-voting member of the COST.  Defs. Ex. 6 at 29.  Thus, the contention that the COST had ex parte communications with CALJ Adams to terminate Plaintiff is a fallacy that is legally incorrect.  As a member of the COST, CALJ Adams was required to have ongoing communication with the other COST members to handle COST business such as scheduling meetings or discussing matters regarding other ALJs.  At no point was he required to recuse himself from deliberations or discussions involving Plaintiff.  In fact, D.C. Personnel Manual § 3705.4 calls for the CALJ to prepare a record for the COST to review in evaluating ALJs for retention at the conclusion of their terms.  In this instance, he provided a recommendation to the COST after a private citizen filed a complaint about Plaintiff running in a partisan election.  Defs. Ex. 6.  An internal OAH investigation revealed Plaintiff indeed was running in a *partisan election* which was a violation of the OAH Code of Ethics.  *Id.*  CALJ Adams promptly notified the COST of Plaintiff's actions and then the COST voting members made the independent determination to terminate Plaintiff's employment on August 2, 2016.  Defs. Ex. 6.  These facts are undisputed and clearly were not based on discriminatory practices due to race or color.

The evidence of record clearly demonstrated a legitimate non-discriminatory/non-retaliatory reason for terminating Plaintiff's employment.  Plaintiff has not met the burden of proof to show "sufficient reasonable evidence for a jury to find the employer's justifications for the challenged action are merely pretext for underlying, unlawful discrimination."  *Byrd v. District of Columbia*, 807 F. Supp. 2d 37, 72 (D.D.C. 2011).  Plaintiff's failure to assert a material fact that disputes the COST's non-discriminatory/non-retaliatory decision to terminate

19

her ALJ position is fatal to her claim and warrants this Court granting Defendants' motion for summary judgment.

## **<u>CONCLUSION</u>**

For the foregoing reasons, along with those in Defendants' initial motion, the Court should enter a judgment in favor of Defendants on all remaining claims.

Date:   May 14, 2021                    Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

CHAD COPELAND
Deputy Attorney General
Civil Litigation Division

*/s/ Alicia M. Cullen*
ALICIA M. CULLEN [1015227]
Chief, Civil Litigation Division, Section III

*/s/ Antoine M. Williams*
KERSLYN D. FEATHERSTONE [478758]
Senior Assistant Attorney General
ANTOINE M. WILLIAMS [1632929]
Assistant Attorney General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone:  (202) 724-6600; (202) 256-2810
Fax:  (202) 741-8924, (202) 741-8995
Email:  kerslyn.featherstone@dc.gov
antoine.williams1@dc.gov
*Counsel for Defendants District of Columbia and*
*Eugene Adams*